(Slip Opinion)

# Reimbursing the Attorney's Fees of Current and Former Federal Employees Interviewed as Witnesses in the Mueller Investigation

The Department of Justice Representation Guidelines authorize, on a case-by-case basis, the reimbursement of attorney's fees incurred by a current or former federal government employee interviewed as a witness in the Mueller Investigation under threat of subpoena about information the person acquired in the course of his government duties.

October 7, 2020

MEMORANDUM OPINION FOR THE
ACTING ASSISTANT ATTORNEY GENERAL
CIVIL DIVISION

You have asked for our opinion on the scope of the Attorney General's authority to reimburse the attorney's fees of federal employees who were interviewed as witnesses in connection with the investigation by Special Counsel Robert S. Mueller, III into possible Russian interference in the 2016 presidential election ("Mueller Investigation"). The Civil Division reviews requests for such reimbursement under long-standing Department of Justice ("Department") regulations. *See* 28 C.F.R. §§ 50.15–50.16. You have asked specifically how certain elements of section 50.15 apply to the Mueller Investigation: (1) whether a person interviewed as a witness in the Mueller Investigation under threat of subpoena should be viewed as having been "subpoenaed," *id*. § 50.15(a); (2) whether a witness interviewed about information acquired in the course of the witness's federal employment appears in an "individual capacity," *id*.; and (3) what factors should be considered in evaluating whether the reimbursement of the attorney's fees of such a witness is "in the interest of the United States," *id*. § 50.15(a)(4).

We conclude that, under the regulation, the Attorney General or his designee may authorize the reimbursement of attorney's fees incurred by current and former federal employees interviewed during the Mueller Investigation under threat of subpoena concerning information obtained during the course of performing their federal duties. We also conclude that such witnesses generally appear in their individual, not official, capacity. These conclusions are consistent with how the Department has

1

treated requests for attorney's fees under the now-lapsed Independent Counsel statute, which was the model for the Special Counsel regulations. *See* Memorandum for Dick Thornburgh, Attorney General, from William P. Barr, Assistant Attorney General, Office of Legal Counsel, *Re: Reimbursement of Attorney Fees for Private Counsel Representing Former Government Officials in Federal Criminal Proceedings* at 9 (Oct. 18, 1989) ("Barr Memorandum"). When the Department last addressed a similar question, then-Deputy Attorney General Eric Holder determined that "for purposes of analyzing representation and reimbursement requests" a Special Counsel investigation is "closely analogous" to an Independent Counsel investigation and should "be treated" as such. Memorandum for the Deputy Attorney General from Robin E. Jacobsohn, Deputy Assistant Attorney General, Civil Division, *Re: Retroactive Reimbursement of Private Counsel Fees in Connection with Federal Criminal Proceedings* at 4 n.3 (Dec. 8, 2000) ("Holder Memorandum") (approved by the Deputy Attorney General). We agree with that conclusion and believe that it should apply to the Mueller Investigation as well.

As we explain below, it will often be in the interest of the United States to provide reimbursement of such attorney's fees, at least for any person who was a mere witness and not a subject or target of the investigation.[1] The Mueller Investigation, like the Independent Counsel investigations on which the Special Counsel regulation was modeled, operated in a politicized, publicized, and highly contentious environment, and addressed the actions of a number of senior government officials, including the President. Such investigations often require current and former federal employees to incur substantial attorney's fees simply because they witnessed sensitive government deliberations in the course of doing their jobs. Absent reimbursement, the prospect of incurring such fees would deter individuals from serving in key government positions and from perform-

---

[1] While we understand that a number of current and former federal employees interviewed by the Special Counsel are expected to make requests for reimbursement of attorney's fees, we are informed that to date the Department has received only one such formal request. *See* Letter for Scott Schools, Associate Deputy Attorney General, from Dana J. Boente, Acting Assistant Attorney General, National Security Division at 1 (Jan. 2, 2018). We understand that the Civil Division has deferred consideration of whether Mr. Boente should be reimbursed for attorney's fees until he resubmits his request in light of the fact that the Mueller Investigation has concluded.

ing their duties. Reimbursing the attorney's fees of these witnesses therefore would generally be in the interest of the United States, at least for witnesses who were not a subject or a target of the investigation.

## I.

The Attorney General has promulgated regulations providing for the appointment of a Special Counsel, who may be tasked with undertaking particularly sensitive investigations of high-ranking Executive Branch officials. *See* 28 C.F.R. pt. 600; *see also Office of Special Counsel*, 64 Fed. Reg. 37,038 (July 9, 1999). Those regulations were intended to replace authorities under the lapsed Independent Counsel statute. *See* Ethics in Government Act of 1978, Pub. L. No. 95-521, 92 Stat. 1824 (codified as amended at 28 U.S.C. §§ 591–599); *see also* Independent Counsel Reauthorization Act of 1994, Pub. L. No. 103-270, 108 Stat. 732 (1994) (extending authorities through 1999); *see generally Morrison v. Olson*, 487 U.S. 654 (1988). Like an Independent Counsel, a Special Counsel exercises federal prosecutorial power with a degree of autonomy; although a Special Counsel is subject to the supervision of the Attorney General, a regulation makes him removable only for cause. *Compare* 28 U.S.C. § 596(a)(1), *with* 28 C.F.R. §§ 600.6, 600.7(b), (d).

On May 17, 2017, Acting Attorney General Rod J. Rosenstein appointed Robert S. Mueller, III to serve as Special Counsel to investigate "any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump," and related matters. Att'y Gen. Order No. 3915-2017 (May 17, 2017). In addition to the principal subject of the investigation, the Special Counsel also investigated whether the President had obstructed justice in connection with Russia-related investigations. *See* 2 Report on the Investigation into Russian Interference in the 2016 Presidential Election 1 (Mar. 2019) ("Mueller Report"), https://www.justice.gov/storage/report.pdf.

The Special Counsel's Office was well-resourced and its probe wide-ranging. The Special Counsel "assembled a team that at its high point included 19 attorneys"; "three paralegals"; and "an administrative staff of nine." 1 Mueller Report at 13. These individuals "were co-located with and worked alongside" approximately 40 agents of the Federal Bureau of Investigation ("FBI"), as well as intelligence analysts, forensic account-

3

ants, a paralegal, and professional staff assigned by the FBI to assist the Special Counsel's investigation. *Id*. During the investigation, the Special Counsel "issued more than 2,800 subpoenas under the auspices of a grand jury sitting in the District of Columbia; executed nearly 500 search-and-seizure warrants; obtained more than 230 orders for communication records . . . ; obtained almost 50 orders authorizing use of pen registers; made 13 requests to foreign governments pursuant to Mutual Legal Assistance Treaties; and interviewed approximately 500 witnesses, including almost 80 before a grand jury." *Id*. As of May 2019, when the Special Counsel resigned, the Special Counsel's Office had spent about $16 million on the investigation, and other components of the Department had contributed another $15.5 million in support. U.S. Dep't of Justice, *Special Counsel Office's Statement of Expenditures, May 17, 2017 Through February 25, 2020*, at 2–3 (undated), https://www.justice.gov/sco/page/file/1266756/download.

The Special Counsel's investigation of obstruction of justice devoted substantial resources to interviewing federal employees, including many in the White House and some from the Department, concerning their conversations with the President and senior White House staff. The Special Counsel investigated, for example, the President's dealings with James Comey, the former Director of the FBI, including the President's response to Comey's March 20, 2017, congressional testimony, and the decision to terminate him. *See* 2 Mueller Report at 38–41, 52–77. The Special Counsel also probed the President's subsequent deliberations concerning the Special Counsel investigation and the recusal of Attorney General Jefferson B. Sessions III with respect to that investigation. *Id*. at 63–96, 107–11. All of these inquiries, and many others, entailed interviews with numerous current and former government employees concerning knowledge acquired in the course of their official duties. All told, we understand that the Special Counsel interviewed at least 40 current and former government employees, including many who worked in senior positions at the White House and the Department. With the exception of former National Security Advisor Michael Flynn, none of those employees was charged with any criminal offense.

In March 2019, the Special Counsel concluded his investigation and submitted to Attorney General William P. Barr the confidential, two-volume Mueller Report summarizing his conclusions, charging decisions,

and the evidence the investigation had produced. *See* 28 C.F.R. § 600.8(c) ("At the conclusion of the Special Counsel's work, he or she shall provide the Attorney General with a confidential report explaining the prosecution or declination decisions reached by the Special Counsel."). We understand that you expect several current and former government employees interviewed in connection with the Mueller Investigation to seek reimbursement of attorney's fees they incurred in connection with those interviews. *See supra* note 1.

## II.

Congress has authorized the Attorney General to dispatch "[t]he Solicitor General, or any officer of the Department of Justice, . . . to attend to the interests of the United States" in any federal or state proceeding. 28 U.S.C. § 517. The Department provides representation automatically for federal employees who are subject to legal process in their official capacities—that is, when the government itself is the real party in interest, in the sense that court-ordered relief would be paid from the Treasury of the United States or direct federal employees in the performance of their official duties. *See* Memorandum for the Deputy Attorney General from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Reimbursement of Anne M. Burford for Private Counsel Fees* at 3 n.3 (May 3, 1983) ("Olson Memorandum"); *see also Graham v. Kentucky*, 473 U.S. 159, 165–66 (1985).

The Attorney General's authority also includes the power "to represent the personal interests of [federal] officers and employees who are sued in their personal capacities" where such interests "coincide" with "the interests of the United States." *Representation of Government Employees in Cases Where Their Interests Diverge from Those of the United States*, 4B Op. O.L.C. 528, 531 (1980). If "private and public interests coincide, the representation of private interests is tantamount to representation of the interests of the United States." *Id.* The prototypical instance of this convergence is when a federal employee is sued in his individual capacity for actions taken in the course and scope of his employment, such as a suit under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), that seeks damages for allegedly unconstitutional conduct taken under color of the employee's federal office. "In such

proceedings, the United States ordinarily has interests substantially identical to those of the employee in establishing the lawfulness of authorized conduct on behalf of the United States and in relieving the employee of the threat and burden of litigation that might otherwise chill the performance of official duties." Barr Memorandum at 9. After all, "[n]o man of common prudence would enter the public service if he knew that the performance of his duty would render him liable to be plagued to death with lawsuits, which he must carry on at his own expense." *Case of Captain Wilkes*, 9 Op. Att'y Gen. 51, 52 (1857). At the same time, we have recognized that the Attorney General should not provide representation to vindicate interests that are "purely personal." *Representation of White House Employees*, 4B Op. O.L.C. 749, 753 (1980). Examples of purely personal interests include "the interests in avoiding federal criminal prosecution, civil liability to the United States[,] or adverse administrative action by a federal agency." *Id.*

The Attorney General's authority to represent federal employees includes the authority to "attend to the interests of the United States by authorizing the retention of private counsel at government expense, or the reimbursement of counsel fees incurred." Barr Memorandum at 12 n.15; *see also* Memorandum for Glen E. Pommerening, Assistant Attorney General for Administration, from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel, *Re: Authority for Employment of Outside Legal Counsel* at 1 (Mar. 4, 1976) ("Scalia Memorandum"). "The conclusion that the Attorney General has such implied authority is based on that fact that he possesses not only representational authority, *see* 28 U.S.C. § 517, but executive authority as well, *see* 28 U.S.C. § 509, and the latter may be used in furtherance of the former." *Reimbursing Justice Department Employees for Fees Incurred in Using Private Counsel Representation at Congressional Depositions*, 14 Op. O.L.C. 132, 135 (1990) ("*Reimbursing Justice Department Employees*"). Reimbursement of attorney's fees paid to private counsel, rather than representation by government attorneys, may be warranted when representation of the federal employee would serve the interest of the United States, but government attorneys themselves may have a conflict of interest or otherwise be unable to provide representation. For example, it may serve the interest of the United States to represent an employee in a federal criminal investigation, but the government itself would have a conflict of interest in

representing the employee; in such a case, it may be appropriate for the employee to retain a private attorney and for the government to reimburse the employee's attorney's fees. *See* Scalia Memorandum at 6; Barr Memorandum at 16–17.

The Attorney General has implemented these principles in regulations known as the "Representation Guidelines." *See* 28 C.F.R. §§ 50.15–50.16. Section 50.15(a) of the Representation Guidelines provides for representation of current and former federal employees:

> [A] federal employee (hereby defined to include present and former Federal officials and employees) may be provided representation in civil, criminal and Congressional proceedings in which he is sued, subpoenaed, or charged in his individual capacity, not covered by § 15.1 of this chapter, when the actions for which representation is requested reasonably appear to have been performed within the scope of the employee's employment and the Attorney General or his designee determines that providing representation would otherwise be in the interest of the United States.

*Id*. § 50.15(a).[2] Subsection (a)(4) applies to federal criminal proceedings, such as the Mueller Investigation. *See id*. §§ 600.1, 600.4(a). It provides:

> Representation generally is not available in federal criminal proceedings. Representation may be provided to a federal employee in connection with a federal criminal proceeding only where the Attorney General or his designee determines that representation is in the interest of the United States and subject to applicable limitations of § 50.16. In determining whether representation in a federal criminal proceeding is in the interest of the United States, the Attorney General or his designee shall consider, among other factors, the relevance of any non-prosecutorial interests of the United States, the importance of the interests implicated, the Department's ability to protect those interests through other means, and the likelihood of a

---

[2] Section 15.1 of title 28 of the Code of Federal Regulations governs instances in which the United States is substituted as the defendant for a federal employee sued for actions taken in the course and scope of his employment, thus making the suit one against the United States itself and individual representation unnecessary. *See* 28 U.S.C. § 2679(b)(1), (d).

conflict of interest between the Department's prosecutorial and representational responsibilities. If representation is authorized, the Attorney General or his designee also may determine whether representation by Department attorneys, retention of private counsel at federal expense, or reimbursement to the employee of private counsel fees is most appropriate under the circumstances.

*Id*. § 50.15(a)(4).

Section 50.16 governs the retention of private counsel for the employee. The Department may approve the retention of counsel in advance and pay attorney's fees as they are incurred. *Id*. § 50.16(c). Or the Department may reimburse after the fact the attorney's fees an employee has incurred. *Id*. § 50.16(d). Reimbursement is limited to "legal work that is determined to be in the interest of the United States" and is not available "for legal work that advances only the individual interests of the employee." *Id*. § 50.16(d)(1). In particular, "[r]eimbursement shall not be provided if the United States decides to seek an indictment of or to file an information against the employee seeking reimbursement, on a criminal charge relating to the conduct concerning which representation was undertaken." *Id*. § 50.16(d)(4).

## III.

You have asked how certain elements of the Representation Guidelines should apply to requests for reimbursement of attorney's fees incurred by federal employees interviewed as witnesses in the Mueller Investigation concerning information obtained during the course of their federal duties. Specifically, you have asked: (1) whether such a witness interviewed under threat of subpoena should be viewed as "subpoenaed," 28 C.F.R. § 50.15(a); (2) whether such a witness appears in his "individual capacity," *id*.; and (3) what factors should be considered in evaluating "the interest of the United States," *id*. § 50.15(a)(4), in reimbursing those fees. We address each question in turn.

## A.

Section 50.15(a) provides that a present or former federal employee "may be provided representation in civil, criminal and Congressional

proceedings in which he is sued, subpoenaed, or charged in his individual capacity." *Id*. § 50.15(a). The word "subpoenaed" clearly embraces a witness who is served with a subpoena. We think that the term also applies to a witness who submits to an interview under express or implied threat of subpoena.

At first blush, section 50.15 might be read to require the formal service of a complaint, subpoena, or charge before an employee qualifies for representation. But we do not think the regulation requires such formality. A federal employee who submits to an interview under threat of subpoena may reasonably be considered to have been "subpoenaed" because he has complied with the request under threat of the potential penalties that would attach to a refusal to comply with the threatened subpoena. Similarly, we understand that the Civil Division has sometimes provided representation under the regulation when a federal employee has been threatened with a personal-capacity suit and requires representation.

Just as the Representation Guidelines permit representation of an employee credibly threatened with a lawsuit, we think the regulation also permits representation for an interview conducted under threat of subpoena. It is common practice for an investigator with subpoena authority to negotiate for a witness's voluntary appearance in lieu of the need for formal testimony in compliance with a subpoena. In federal criminal investigations, for instance, Department attorneys are encouraged to consider seeking the voluntary cooperation of a witness before issuing a grand jury subpoena. *See* U.S. Dep't of Justice, *Justice Manual* § 9-11.254 (2018) (providing that "[b]efore issuing a grand jury subpoena, prosecutors should consider . . . whether a voluntary request . . . is available to obtain the information sought"). In congressional inquiries, the Executive Branch similarly expects congressional committees to seek the voluntary appearances of witnesses prior to the issuance of a subpoena, as part of the "constitutionally mandated accommodation process." *Authority of the Department of Health and Human Services to Pay for Private Counsel to Represent an Employee Before Congressional Committees*, 41 Op. O.L.C. __, at *3 (Jan. 18, 2017) ("*Authority to Pay for Private Counsel*"); *see also Response to Congressional Requests for Information Regarding Decisions Made under the Independent Counsel Act*, 10 Op. O.L.C. 68, 81 (1986) (explaining that "rarely do congressional requests for information result in a subpoena of an Executive Branch official"

because "[i]n most cases the informal process of negotiation and accommodation . . . is sufficient to resolve any dispute"). We think it would be implausible to read the Representation Guidelines to be inapplicable in these common circumstances, in which the government interests at stake are not substantively different from when an employee is served with a formal subpoena.

This conclusion is supported by Civil Division practice. In a 1995 memorandum, the Director of the Torts Branch explained that "[w]e have construed the 'subpoena' requirement to encompass situations where the employee appears voluntarily but would be subject to a subpoena but for his or her voluntary appearance." Memorandum for Frank W. Hunger, Assistant Attorney General, Civil Division, from Helene M. Goldberg, Director, Torts Branch, Civil Division, *Re: Payment of Private Counsel Fees in Connection with Whitewater Investigation* at 2 n.1 (Aug. 10, 1995) ("Whitewater Memorandum"). Since then, we understand that the Civil Division has generally, although not uniformly, adhered to this view.[3] For example, in 2000, the Civil Division approved several requests for reimbursement of attorney's fees incurred by federal employees who appeared as witnesses in connection with congressional inquiries without any indication that a congressional subpoena was ever issued.[4] Moreover, in several instances the Civil Division has reimbursed employees for retaining a private attorney for a voluntary interview given to federal criminal investigators in lieu of testimony before a grand jury after the employee received a subpoena for such testimony.[5] It would make little

---

[3] We are aware of one instance in which the Civil Division expressed a contrary view. *See* Letter for Beth Nolan, Counsel to the President, from Stuart E. Schiffer, Deputy Assistant Attorney General, Civil Division at 2 (June 1, 2000) ("Mr. McLarty's request for reimbursement is granted to the extent he seeks reimbursement of private counsel fees and costs incurred subsequent to being served with a subpoena . . . but denied to the extent he seeks reimbursement of private counsel fees and costs incurred prior to being served with a subpoena.").

[4] *See, e.g.*, Letter for Beth Nolan, Counsel to the President, from Stuart E. Schiffer, Deputy Assistant Attorney General, Civil Division (Aug. 3, 2000) (granting in part request from White House Counsel's Office to reimburse attorney's fees incurred by former Deputy Assistant to the President and Deputy Director of Presidential Personnel).

[5] *See* Memorandum for Stuart E. Schiffer, Deputy Assistant Attorney General, Civil Division, from Helene M. Goldberg, Director, Torts Branch, Civil Division at 2 (Nov. 15, 2000) (granting reimbursement request of Department of Interior employee who "was

sense to read section 50.15(a) to authorize the reimbursement of attorney's fees for a voluntary interview conducted after formal issuance of a subpoena, but not for one conducted under credible threat of subpoena.

We thus do not construe the term "subpoenaed" to require issuance of a formal subpoena before the regulation becomes applicable. A contrary conclusion would establish a perverse incentive for federal employees to decline to cooperate and instead to trigger the issuance of formal subpoenas, which could result in additional attorney's fees, potentially at the expense of the United States.[6]

---

served with a grand jury subpoena" and "agreed to an interview in lieu of [a] grand jury appearance"); Memorandum for Stuart E. Schiffer, Deputy Assistant Attorney General, Civil Division, from Helene M. Goldberg, Director, Torts Branch, Civil Division at 2 (Nov. 15, 2000) (same); Memorandum for Stuart E. Schiffer, Deputy Assistant Attorney General, Civil Division, from Helene M. Goldberg, Director, Torts Branch, Civil Division at 3 (Aug. 3, 2000) (same with respect to request of former Deputy Assistant to the President and Deputy Director of Presidential Personnel). These memoranda briefly present the facts of the requests and convey the recommendations of the Director of the Torts Branch as to whether the Civil Division should approve them. A note-to-file affixed to each memorandum and bearing the same date indicates that each request was approved at least in part.

[6] Even if a person were not "subpoenaed" within the meaning of section 50.15(a), the Attorney General would still have the authority under 28 U.S.C. § 517 to provide representation if it were in the interest of the United States to do so. Representation, including the reimbursement of private-counsel fees, may be provided outside the framework of the Representation Guidelines. *See Reimbursing Justice Department Employees*, 14 Op. O.L.C. at 134–37 & n.3. For instance, although the regulation covers only the representation of "present and former Federal officials and employees," 28 C.F.R. § 50.15(a), the Attorney General may also represent non-governmental employees where it is in the interest of the United States to do so. *See Hall v. Clinton*, 285 F.3d 74, 80 (D.C. Cir. 2002) (holding that the Department may represent the First Lady under 28 U.S.C. § 517 "even if" she were a deemed a "purely private citizen at all times relevant"); Constitutional Torts Staff, Torts Branch, Civil Division, U.S. Dep't of Justice, *The Fundamentals of Individual Capacity Representation of Federal Employees in Civil and Criminal Proceedings* 32 (Oct. 2018) (noting that "representation also may be provided to non-government employees under the general authority of 28 U.S.C. § 517"). And nothing in the Representation Guidelines is to the contrary; the regulations do not prohibit representing federal employees who have not been subpoenaed, but merely authorize representation to be provided to subpoenaed employees. 28 C.F.R. § 50.15(a). As a result, nothing in the Representation Guidelines precludes the Attorney General from authorizing representation under the statute even for a witness who was not "subpoenaed."

**B.**

Section 50.15(a) also covers representation when a current or former federal employee is subpoenaed "in his individual capacity." We believe that when an investigator, such as the Special Counsel, seeks information from such a person concerning matters within his personal knowledge, that person generally appears in his individual capacity, even when that information was acquired during the course of the performance of the witness's federal duties.

In determining whether a suit is brought against a government official in his official or individual capacity, the Supreme Court has examined "[t]he identity of the real party in interest." *Lewis v. Clarke*, 137 S. Ct. 1285, 1292 (2017). "In an official-capacity claim," the Court has explained, "the relief sought is only nominally against the official and in fact is against the official's office and thus the sovereign itself." *Id*. "This is why, when officials sued in their official capacities leave office, their successors automatically assume their role in the litigation." *Id*.; *see also Hafer v. Melo*, 502 U.S. 21, 25 (1991) (explaining that "official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent" (internal citations and quotation marks and omitted)). "Personal-capacity suits, on the other hand, seek to impose *individual* liability upon a government officer." *Hafer*, 502 U.S. at 25 (emphasis added).

We think the meaning of "individual capacity" in 28 C.F.R. § 50.15(a) tracks this distinction: a witness appears in his personal capacity when he is personally threatened with potential liability from a subpoena. The typical instance in which a federal employee receives government representation under this regulation, after all, is a constitutional tort suit against that employee under *Bivens*, which seeks to recover damages from the employee personally. Though such suits arise from actions taken by the employee in the course and scope of his government employment, such suits are nonetheless considered to be against the employee in his individual capacity. *See FDIC v. Meyer*, 510 U.S. 471, 485–86 (1994). Notably, the regulation does not apply to suits in which the United States has been substituted as the defendant for a federal employee sued for actions taken in course and scope of his employment, *supra* note 2, which relieves the employee of personal liability. That exemption underscores that the regu-

lation is concerned with proceedings in which a person is exposed to personal liability as a result of his official conduct as a government employee. And we have previously used the concept of whether such a person faces a threat of personal liability to distinguish official-capacity from individual-capacity proceedings under the Representation Guidelines. *See* Memorandum for Peter J. Wallison, Counsel to the President, from Samuel A. Alito, Jr., Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Federal Retirement Thrift Investment Board* at 1 (Sept. 24, 1986) (equating "personal capacity" under the Representation Guidelines with whether the employee's "personal resources" were at stake); Memorandum for Glen L. Archer, Jr., Assistant Attorney General, Tax Division, from Ralph W. Tarr, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Authority of Tax Division to Pay Legal Fees of Private Counsel* at 2 (Feb. 28, 1984) (similar).

A person interviewed in connection with the Mueller Investigation would generally be appearing in his individual capacity even if the person were conveying information he acquired in the course of performing his official government duties. Such information would generally be information in that individual's personal knowledge, not information to be provided by virtue of his government office. In the case of a former employee, for example, the Special Counsel in most instances could not seek testimony from his successor in office, because the successor would not have personal knowledge of the matters being investigated. And should the person unlawfully refuse to provide the information, it would be he, and not the federal government, who would be subject to potential liability for civil and criminal contempt. *See* 18 U.S.C. § 401; 28 U.S.C. § 1826.

Consider, for example, the Special Counsel's request to interview Dana J. Boente. Mr. Boente served as the Acting Deputy Attorney General from February 8, 2017 to April 25, 2017. Special Counsel Mueller sought to interview Mr. Boente "because of his positions and his roles . . . [in] events in which *he* participated." Letter for Chad A. Readler, Acting Assistant Attorney General, Civil Division, from Scott Schools, Associate Deputy Attorney General at 1 (Jan. 12, 2018) (emphasis added); *see also* Letter for Scott Schools, Associate Deputy Attorney General, from Dana J. Boente, Acting Assistant Attorney General, National Security Division at 1 (Jan. 2, 2018) ("Special Counsel Robert Mueller has asked to inter-

view *me*[.] In the event *I* do not submit to an interview, Special Counsel Mueller would have the authority to issue a subpoena for *my* testimony[.]" (emphases added)). In other words, the Special Counsel sought information from Mr. Boente, not from the Office of the Deputy Attorney General. And had the Special Counsel served Mr. Boente with a subpoena, the obligation to testify (and any penalties for a failure to do so) would run against Mr. Boente personally—not the federal government. Thus, the real party in interest would be the witness, Mr. Boente.

This conclusion does not mean that a federal employee subpoenaed in his official, rather than, individual, capacity would be ineligible for government representation. There are examples of official-capacity subpoenas. A custodian of records belonging to a federal agency who provides information about the records or the manner in which they are maintained, for example, does so in his official capacity as a representative of the agency. *See, e.g.*, 20 C.F.R. § 423.3; 37 C.F.R. § 205.22(a)(1); 44 C.F.R. § 5.83; 45 C.F.R. § 4.2; *see also* 28 C.F.R. § 0.77(j) (instructing the Assistant Attorney General for Administration to accept service of subpoenas "directed to the Attorney General in his official capacity"). But "[r]epresentation of employees in their *official capacities* is provided automatically, without reference to the representation guidelines." Olson Memorandum at 3 n.3. We are not aware that the Special Counsel, who received broad access to the records of the federal government, compelled witnesses or testimony from any person in an official government capacity. But if the Special Counsel did so, the witness's official-capacity status would automatically entitle the witness to government representation without regard to the Representation Guidelines.

## C.

The fact that a witness is subpoenaed to testify in his individual capacity about information acquired during the course of his federal employment does not alone justify reimbursing his attorney's fees. The Department must also determine that reimbursement would be in the "interest of the United States." 28 U.S.C. § 517; 28 C.F.R. § 50.15(a)(4). Although we are not in a position to make that determination as to any particular witness, you have asked us for guidance on how the Department should evaluate whether it is in the interest of the United States to reimburse the

attorney's fees of witnesses interviewed in connection with the Mueller Investigation about information they acquired in the course of their government employment.

### 1.

The Representation Guidelines provide that government representation "generally is not available in federal criminal proceedings." 28 C.F.R. § 50.15(a)(4). This presumption reflects the fact that in federal criminal proceedings, the interest of the United States "ordinarily can be expected to be represented fully by the federal prosecutor, who is answerable in the executive branch hierarchy to the Attorney General, who in turn is directly accountable to the President." Barr Memorandum at 10. That is especially true when the person seeking representation is a subject or target of the criminal investigation.[7] In such an instance, the interest of the United States lies in favor of enforcing the law against the subject or target, rather than assisting the person in avoiding criminal liability. *Id*. at 13–14. But even in federal criminal proceedings, there may be "situations in which representation of an employee who is a witness . . . would be completely consistent with the interests of the prosecution and in which it would be in the United States' interest to provide representation." *Id*. at 14. For example, "for Administration officials simply, and properly, doing their jobs" who are asked to provide information acquired in the course of their government duties, representation may be warranted to avoid the "specter of personal liability for attorneys fees." *Id*. at 18 (internal quotation marks omitted).

Accordingly, the Representation Guidelines recognize that there are circumstances where it is in the interest of the United States to represent current and former government employees in federal criminal proceed-

---

[7] The Department's *Justice Manual* explains that "[a] 'target' is a person as to whom the prosecutor or the grand jury has substantial evidence linking him or her to the commission of a crime and who, in the judgment of the prosecutor, is a putative defendant," and "[a] 'subject' . . . is a person whose conduct is within the scope of the grand jury's investigation." U.S. Dep't of Justice, *Justice Manual* § 9-11.151 (Jan. 2020). The Representation Guidelines also note that "[a]n employee is the subject of an investigation if, in addition to being circumstantially implicated by having the appropriate responsibilities at the appropriate time, there is some evidence of his specific participation in a crime." 28 C.F.R. § 50.15(a)(5).

ings. They establish no fixed formula governing that determination. Instead, they provide for consideration of, "among other factors, the relevance of any non-prosecutorial interests of the United States, the importance of the interests implicated, the Department's ability to protect those interests through other means, and the likelihood of a conflict of interest between the Department's prosecutorial and representational responsibilities." 28 C.F.R. § 50.15(a)(4).

## 2.

In analyzing the interests at stake when current or former government employees appear as witnesses in Special Counsel investigations, we are guided by the parallels to investigations conducted by Independent Counsels. The Department's Special Counsel regulations "replace[d] the procedures set out in the Independent Counsel Reauthorization Act of 1994." *Office of Special Counsel*, 64 Fed. Reg. at 37,038.

This Office has previously recognized that the United States has a strong interest in reimbursing current or former government officials who incur attorney's fees as a result of appearing as witnesses in Independent Counsel investigations. In 1989, we analyzed whether it was in the interest of the United States to reimburse attorney's fees incurred by former President Ronald Reagan and former Deputy Assistant Attorney General Michael Dolan. We observed that Mr. Dolan had incurred substantial attorney's fees for little reason other than he was "caught in a power struggle between Congress and the executive branch" that was the subject of the Independent Counsel investigation, which examined whether Department officials had committed perjury in connection with congressional testimony concerning federal environmental regulation. Barr Memorandum at 18 (internal quotation marks omitted). In such circumstances, the United States has a strong interest in avoiding the chilling effects that the prospect of liability for attorney's fees would have on "Administration officials simply, and properly, doing their jobs," which is akin to "the chilling effect of liability that support[s] indemnification of federal officers in *Bivens* actions." *Id*. (internal quotation marks omitted).

In accordance with this advice, the Department has a long practice of reimbursing the attorney's fees of current or former federal employees who appeared as witnesses in connection with Independent Counsel

investigations. During the George H.W. Bush Administration, the Civil Division approved reimbursement requests from at least 14 employees of the White House and Central Intelligence Agency who were witnesses for the Independent Counsel in the Iran-Contra investigation. *See* Memorandum for the Deputy Attorney General from Donald M. Remy, Deputy Assistant Attorney General, Civil Division, *Re: Implementation of Representation Guidelines in Federal Criminal Proceedings* at 1, 3–4 (June 3, 1998). During the Clinton Administration, the Civil Division approved reimbursement requests from at least 9 employees who appeared in connection with numerous Independent Counsel investigations and congressional inquiries.[8] Early in the George W. Bush Administration, the Civil

---

[8] *See* Letter for Karen Sprecher Keating, Associate Solicitor, Department of the Interior, from Stuart E. Schiffer, Deputy Assistant Attorney General, Civil Division (Nov. 15, 2000) (granting in part request of Deputy Assistant Secretary in connection with Independent Counsel investigation); Letter for Karen Sprecher Keating, Associate Solicitor, Department of the Interior, from Stuart E. Schiffer, Deputy Assistant Attorney General, Civil Division (Nov. 15, 2000) (granting in part request of Assistant to the Deputy Chief of Staff to the Secretary of Interior in connection with Independent Counsel investigation); Letter for John J. Kelleher, Chief Counsel, Department of the Treasury, from Stuart E. Schiffer, Deputy Assistant Attorney General, Civil Division (Nov. 15, 2000) (granting request from Secret Service agent in connection with Independent Counsel investigation) ; Letter for Beth Nolan, Counsel to the President, from Stuart E. Schiffer, Deputy Assistant Attorney General, Civil Division (Aug. 28, 2000) (granting request from former Special Assistant to the President and Assistant to the Chief of Staff in connection with Independent Counsel investigation); Letter for Sam E. Hutchinson, Associate General Counsel, Department of Housing and Urban Development, from Stuart E. Schiffer, Deputy Assistant Attorney General, Civil Division (Aug. 24, 2000) (granting in part request from former Special Assistant to the Secretary of Housing and Urban Development in connection with Independent Counsel investigation); Letter for Beth Nolan, Counsel to the President, from Stuart E. Schiffer, Deputy Assistant Attorney General, Civil Division (Aug. 3, 2000) (granting in part request from former Deputy Assistant to the President and Deputy Director of Presidential Personnel in connection with Independent Counsel investigation and three congressional inquiries); Letter for Beth Nolan, Counsel to the President, from Stuart E. Schiffer, Deputy Assistant Attorney General, Civil Division (June 1, 2000) (granting request from former Deputy Assistant to the President and Press Secretary to the First Lady in connection with five Independent Counsel investigations and four congressional inquiries); Letter for Beth Nolan, Counsel to the President, from Stuart E. Schiffer, Deputy Assistant Attorney General, Civil Division (June 1, 2000) (granting in part request from former Chief of Staff, Counselor, and Assistant to the President in connection with five Independent Counsel investigations and six congressional inquiries); Letter for Beth Nolan, Counsel to the President, from Stuart E. Schiffer, Deputy Assistant Attorney General, Civil Division (June 1, 2000) (granting request from

Division approved a reimbursement request from a former employee in the Clinton White House who appeared as a witness in an Independent Counsel investigation. *See* Letter for Jeffrey S. Jacobovitz from Stuart E. Schiffer, Deputy Assistant Attorney General, Civil Division (Mar. 8, 2001) (granting request of former Director of White House Gift Office and staff member of the Office of the Social Secretary). In each instance, the Civil Division concluded that the witness should be reimbursed where it appeared from all available information that the questioning addressed matters occurring in the course of his government duties, where the witness was neither a subject nor a target of the investigation, and where there was no indication that he had acted inconsistently with the interest of the United States.

### 3.

Considering this practice, and the factors set forth in the Representation Guidelines, we think that government representation, and reimbursement of attorney's fees, will generally be in the interest of the United States for persons interviewed in Special Counsel investigations, such as the Mueller Investigation, concerning information acquired in the course of performing their government duties, where the witness was not a subject or target of the investigation.

We see no reason to distinguish Independent Counsel investigations from Special Counsel investigations for this purpose. Special Counsel Mueller conducted his investigation under the auspices of regulations that provided autonomy similar to that exercised by Independent Counsels before him to investigate politically sensitive criminal matters. A Special Counsel is invested with the "full power" of a United States Attorney, 28 C.F.R. § 600.6, just as an Independent Counsel exercised "all investigative and prosecutorial functions and powers of the Department of Justice," 28 U.S.C. § 594(a). That power is subject to supervision; a Special Counsel is generally supervised by the Attorney General, *see* 28 C.F.R. § 600.7, just as the Independent Counsel statute provided the Attorney General "several means of supervising or controlling,"

---

former Director of White House Special Projects and Executive Assistant to the Chief of Staff in connection with Independent Counsel investigation and congressional inquiry).

*Morrison v. Olson*, 487 U.S. 654, 696 (1988), an Independent Counsel. But that supervisory power is limited in ways that closely parallel the Independent Counsel statute. Like the Independent Counsel statute, the Special Counsel regulations permit the Attorney General to remove the Special Counsel only for cause. *Compare* 28 U.S.C. § 596(a)(1) ("An independent counsel . . . may be removed from office . . . only for good cause, physical or mental disability (if not prohibited by law protecting persons from discrimination on the basis of such a disability), or any other condition that substantially impairs the performance of such independent counsel's duties."), *with* 28 C.F.R. § 600.7(d) ("The Attorney General may remove a Special Counsel for misconduct, dereliction of duty, incapacity, conflict of interest, or for other good cause, including violation of Departmental policies.").

Moreover, the Special Counsel regulations exempt the Special Counsel from the "day-to-day" supervision of any official within the Department. 28 C.F.R. § 600.7(b). The Attorney General may overrule the Special Counsel only where an "action is so inappropriate or unwarranted under established Departmental practices that it should not be pursued," giving "great weight to the views of the Special Counsel," and should the Attorney General overrule the Special Counsel, he is obliged at the conclusion of the investigation to explain that decision to Congress. *Id.*; *see also id.* § 600.9(a)(3). Although the Special Counsel's independence is a matter of regulation, rather than statute, so long as these regulations remain in effect, they insulate the Special Counsel from many of the usual mechanisms of control and accountability, similar to the Independent Counsel. For this reason, then-Deputy Attorney General Holder determined, shortly after the adoption of the Special Counsel regulations, that "for purposes of analyzing representation and reimbursement requests" a Special Counsel investigation is "closely analogous" to investigations under the Independent Counsel statute and should "be treated" as such. Holder Memorandum at 4 n.3.

Independent Counsels and Special Counsels are not only similar in their insulation from supervisory control, but also with respect to the distinctive, politically sensitive matters that occasion their appointment and shape the character of their investigation. Both kinds of special prosecutor are appointed when the Department may have a conflict of interest, typically because there is a need to investigate a senior government official,

including even the President. *Compare* 28 C.F.R. § 600.1, *with* 28 U.S.C. § 591. These prosecutors operate in a publicized, politicized, and contentious environment. Like an Independent Counsel, a Special Counsel is given a public charge to investigate an especially sensitive matter or group of matters, given substantial independence to pursue those subjects, and invariably faced with substantial political pressure to produce results. Armed with vast powers and resources, and a singular focus, Special Counsels have the incentive and means to leave no stone unturned, which often requires interviewing a wide range of witnesses who acquired relevant information in the ordinary course of their jobs as government employees.

As the Department has long recognized in Independent Counsel investigations, these dynamics give the United States a strong "nonprosecutorial interest," 28 C.F.R. § 50.15(a)(4), in ensuring that its employees who are called upon to provide information acquired as a result of their federal employment have a lawyer available at government expense. We have repeatedly recognized that the United States has a considerable interest in protecting "its employees from the burden of undergoing potentially hostile questioning and incurring legal fees as a result of actions taken in good faith" on behalf of the government, which could otherwise "chill the employees' exercise of their official duties." *Authority to Pay for Private Counsel*, 41 Op. O.L.C. __, at *13; Barr Memorandum at 9–10 (similar); *Indemnification of Treasury Department Officers and Employees*, 15 Op. O.L.C. 57, 62 (1991) (similar); *Department of Justice Representation in Federal Criminal Proceedings*, 6 Op. O.L.C. 153, 153–54 (1982) (similar). "[P]roviding counsel to employees facing such burdens serves important government interests in ensuring that Executive Branch employees acting in good faith may discharge their official duties and discretionary functions rigorously, without concern about potential reprisals or legal fees." *Authority to Pay for Private Counsel*, 41 Op. O.L.C. __, at *13. And because a Special Counsel's charge is to fulfill a broad prosecutorial mandate, and not to account for the investigation's burdens on the federal workforce, it is not likely that a Special Counsel will "adequately represent[]" this interest of the United States. Barr Memorandum at 11 n.13.

The Mueller Investigation unquestionably operated in a fraught and high-profile political environment. It was conducted by determined,

experienced, and well-resourced prosecutors under significant political and public scrutiny. The Special Counsel brought multiple charges for false statements for lying to government investigators, e.g., Superseding Information, *United States v. Manafort*, No. 17-cr-201-1 (D.D.C. filed Sept. 14, 2018); Superseding Information, *United States v. Gates*, No. 17-cr-201-2 (D.D.C. filed Feb. 2, 2018); Information, *United States v. Papadopoulos*, No. 17-cr-182 (D.D.C. filed Oct. 3, 2017), and multiple charges for crimes that were separate from the principal purpose of the investigation, e.g., Superseding Indictment, *United States v. Manafort*, No. 18-cr-83 (E.D. Va. filed Feb. 22, 2018) (charging 16 counts related to false individual income tax returns, 7 counts of failure to file reports of foreign bank and financial accounts, 5 counts of bank fraud conspiracy, and 4 counts of bank fraud). All told, the investigation consumed nearly $32 million in government resources. *See supra* Part I. And as noted, the Special Counsel interviewed no fewer than 40 federal government employees, who, with one exception, were not charged with any offense. The breadth and depth of such investigations creates a danger of forcing many federal employees to incur attorney's fees for little reason other than doing their jobs.

We recognize that, in an ordinary federal criminal investigation, it generally is not in the interest of the United States to pay the attorney's fees of witnesses simply because those witnesses acquired relevant information in the course of government employment. Most witnesses do not need a lawyer to cooperate with investigators. But we cannot ignore that a Special Counsel investigation is not an ordinary criminal investigation. A careful and prudent government employee—with no interest or incentive to dissemble—may reasonably feel at personal risk in submitting to an interview and providing information to the Special Counsel, given the history of such interviews leading to further investigation of the witnesses themselves. Owing to the breadth of the federal criminal code, federal prosecutors have enormous charging discretion over a wide range of conduct. *See* Daniel C. Richman & William J. Stuntz, *Al Capone's Revenge: An Essay on the Political Economy of Pretextual Prosecution*, 105 Colum. L. Rev. 583, 608–18 (2005). "Only someone who has worked in the field of law enforcement can fully appreciate the vast power and the immense discretion that are placed in the hands of a prosecutor with respect to the objects of his investigation." *Morrison*, 487 U.S. at 727

(Scalia, J., dissenting). Many witnesses interviewed by the Special Counsel's investigators were high-ranking Administration officials close to the President. The Special Counsel's singular, high-profile mandate, and the politically fraught context in which he operated, mean that witnesses might have reasonably feared that the Special Counsel would "pick[] the man and then search[] the law books . . . to pin some offense on him." *Id*. at 728 (quoting Robert H. Jackson, Attorney General, *The Federal Prosecutor* 5 (Apr. 1, 1940) (address at Second Annual Conference of United States Attorneys)). In this context, such witnesses might reasonably seek the advice and assistance of a lawyer, to be scrupulously careful that "the employee provides accurate and complete information" and to support the employee "in the face of potentially hostile questions," interests that we have recognized would similarly justify the reimbursement of attorney's fees in congressional investigations. *Authority to Pay for Private Counsel*, 41 Op. O.L.C. __, at *13.

The Representation Guidelines do not permit the reimbursement of attorney's fees for "legal work that advances only the individual interests of the employee." 28 C.F.R. § 50.16(d)(1). Witnesses interviewed by the Special Counsel who may now seek reimbursement of attorney's fees no doubt had personal interests in seeking representation. But "these interests are not 'purely personal'; they are 'incidental' to, and in many cases overlap with, the substantial government interests implicated" in providing government representation. *Authority to Pay for Private Counsel*, 41 Op. O.L.C. __, at *16 (quoting *Reimbursing Justice Department Employees*, 14 Op. O.L.C. at 137). These incidental personal benefits do not change the important governmental interests advanced by reimbursing attorney's fees: to avoid the substantial burdens that Special Counsel investigations place on the good-faith labors of government employees.

**4.**

To be clear, we do not believe that reimbursement should be provided simply because a government official incurred attorney's fees appearing as a witness in connection with the Mueller Investigation. The Civil Division still must conclude that doing so is in the interest of the United States, considering all the facts and circumstances of the specific request.

Most notably, if a witness were suspected of wrongdoing, then the calculus may change significantly. Reimbursing a witness who was, for example, a subject or the target of the Special Counsel's investigation itself, may well be inappropriate. Providing government representation to such a person would conflict with the strong prosecutorial interests of the United States. *Cf.* 28 C.F.R. § 50.16(d)(4) ("Reimbursement shall not be provided if the United States decides to seek an indictment of or to file an information against the employee seeking reimbursement, on a criminal charge relating to the conduct concerning which representation was undertaken."). Similarly, if the witness declined to cooperate with the investigation or affirmatively obstructed it, such facts would weigh against reimbursement of attorney's fees. *See* Memorandum for Stuart E. Schiffer, Deputy Assistant Attorney General, Civil Division, from Helene M. Goldberg, Director, Torts Branch, Civil Division, at 2 (Feb. 23, 2001) (recommending that the Department deny reimbursement because the witness offered "evasive" and "unbelievable" answers); Letter for Nancy A. Healy, Chief, Civil Litigation Unit, Federal Bureau of Investigation, from Stuart E. Schiffer, Deputy Assistant Attorney General, Civil Division (Jan. 26, 2001) (denying reimbursement because the witness had failed to cooperate fully with a Special Counsel investigation). As always, the question is whether the representation was in the interest of the United States. *Cf.* 28 C.F.R. § 50.16(c)(2)(iv) ("Federal payment to private counsel for an employee will cease if . . . the Department of Justice . . . [d]etermines that continued representation is not in the interest of the United States."). The United States unquestionably has a strong interest in ensuring that its employees facilitate enforcement of the law, an interest that may justify denying an attorney's fees request by an employee who failed to do so.

## IV.

We conclude that the Representation Guidelines authorize, on a case-by-case basis, the reimbursement of attorney's fees incurred by a current or former federal government employee interviewed as a witness in the Mueller Investigation under threat of subpoena about information the person acquired in the course of his government duties. We also conclude that such a witness generally appears in his individual capacity for purposes of the Representation Guidelines. Finally, consistent with the De-

partment's treatment of Independent Counsel investigations, we conclude that the United States generally has a strong interest in ensuring that its employees have representation in connection with Special Counsel proceedings, which often will support reimbursing attorney's fees incurred by employees interviewed as witnesses in such proceedings, and not as subjects or targets.

HENRY C. WHITAKER
*Principal Deputy Assistant Attorney General*
*Office of Legal Counsel*